IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00050-WJM

UNITED STATES OF AMERICA

    Plaintiff,

v.

ALICIA MORELLI,

    Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by Jason R. Dunn, United States Attorney for the District of Colorado, through Assistant United States Attorney Peter McNeilly, and the defendant, Alicia Morelli, personally and by counsel, Mary V. Butterton, Assistant Federal Public Defender, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

### I. AGREEMENT

The defendant agrees to plead guilty to Count 1 of the Indictment, charging a violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C), Distribution of a Mixture or Substance Containing a Detectable Amount of Heroin, a Schedule I Controlled Substance, Resulting in Death. The defendant will also admit the notice of forfeiture and waive certain appellate rights, as explained in greater detail below.

**Court Exhibit 1**

In exchange for the defendant's plea of guilty and waiver of certain appellate rights, the United States agrees to recommend the Court give the defendant full credit for acceptance of responsibility per United States Sentencing Guidelines (USSG) §3E1.1, unless the defendant engages in conduct that qualifies for the obstruction of justice enhancement under §§ 3C1.1 and 3E1.1, comment (note 4) between the time of the guilty plea and sentencing.

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statute of conviction; (2) the sentence of imprisonment exceeds the sentence of imprisonment recommended by the government; or (3) the government appeals the sentence imposed. If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant

was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.

## II. ELEMENTS OF THE OFFENSE

The parties agree that the elements of the offense to which this plea is being tendered are as follows:[1]

*First*: The defendant knowingly or intentionally distributed a controlled substance as charged;

*Second*: The substance was in fact a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance;

*Third*: Death resulted from the use of the mixture or substance containing a detectable amount of heroin.

## III. STATUTORY PENALTIES

The statutory penalty for Count 1 of the Indictment is not less than 20 years and not more than more than life imprisonment; not more than a $1,000,000 fine; not less than three years, but not more than life of supervised release; and a $100 special assessment fee.

A violation of any condition of supervised release may result in a separate prison sentence and additional supervision.

---

[1] *10th Circuit Pattern Jury Instruction 2.85.1*, Controlled Substances—Distribution Resulting in Death (2018).

3

## IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is on or about June 18, 2019.

The parties further agree as follows:

### The Defendant Sells Heroin to M.H. Which Results in M.H.'s Death

On June 19, 2019, Denver Police Department officers responded to an apartment at 1011 Colorado Boulevard, Denver, Colorado, on the report of an

4

unresponsive female. Upon arrival, first responders located a female, later identified as M.H., lying supine on the bedroom floor. A syringe with needle, a spoon with liquid, and an amount of suspected heroin were located on a table next to where M.H. was lying. M.H. was pronounced dead at 12:11 p.m., but a time of death has not been estimated. On June 20, Dr. Meredith A. Frank, M.D., a forensic pathologist and the Assistant Medical Examiner for the City and County of Denver, performed an autopsy on M.H. Dr. Frank determined M.H. died as a result of the "toxic effects of heroin," and the manner of death was "accident."

As part of the investigation into M.H.'s death, a Denver Police homicide detective spoke to M.H.'s brother. M.H.'s brother advised the detective that, after M.H. was found dead, M.H.'s brother obtained and accessed M.H.'s cell phone. M.H.'s brother observed several text messages between a possible heroin dealer and M.H., which appeared to have occurred just prior to M.H.'s death. M.H.'s brother stated that the heroin dealer appeared to be using phone number (720) 791-5073. M.H.'s brother also discovered that M.H. appeared to have obtained that phone number on an internet forum which exists to facilitate narcotics transactions. At the homicide detective's urging, M.H.'s brother provided all this information and M.H.'s cell phone to federal task force officers assigned to the Drug Enforcement Administration's Front Range Task Force.

The DEA task force officers searched M.H.'s phone and observed a string of text messages between M.H. and the defendant, who was using phone number (720) 791-5073. The text exchange occurred on the evening of June 18, 2019, at approximately 9:05 p.m.—the night before M.H. was found dead in her apartment. The following text messages were part of that exchange:

> Morelli: Hey I am so sorry, I got wrapped up, I had like a rush of the way. If you want to come, I can come now. Where are you?
>
> M.H.: Ok, dope, I'm near Congress Park, does that work for you?
>
> Morelli: Do you want to meet at Congress Park?
>
> M.H.: Yeah that works, I'll park in their lot. How soon can you be there?
>
> Morelli: 20 minutes or less.
>
> Morelli: How much do you want?
>
> M.H.: Will you do just a g?
>
> Morelli: Yes, it's $80
>
> M.H.: Perfect, see you then.

"G" is a common street term when referring to a gram. The text exchange continued with the two parties agreeing on and arranging a meet location. After these text messages, the defendant met briefly with M.H. and sold her a gram of heroin.

The text string with the defendant on M.H.'s phone concluded at 10:22 p.m. on June 18 with the defendant texting, "Let me know what you think and call me anytime, your one of the few girls I have, lol, it's nice." Then, on June 19, at 1:54 p.m., the defendant texted, "What did you think of the quality?" That message went unanswered because M.H. was dead.

The defendant admits she knowingly and intentionally distributed a controlled substance to M.H. on or about June 18, 2019; that the controlled substance she distributed was heroin; and that M.H.'s death resulted from the use of the heroin the defendant distributed.

## An Undercover Officer Buys 1.879 Grams of Heroin
## from the Defendant on June 25, 2019

On June 25, 2019, DEA Task Force Officer Jason Brest set up an undercover heroin purchase with the defendant by contacting her on phone number (720) 791-5073. Brest sent the defendant a text message, requesting to meet in the area of the Safeway parking lot at 6460 E Yale Avenue, Denver, Colorado. Brest told the defendant he wanted to buy two grams of heroin. The defendant replied, via text message, that two grams of heroin would cost $160. The defendant then agreed to meet Brest and provide him with the heroin.

Members of the Front Range Task Force set up surveillance in the area of the Safeway parking lot at 6460 E. Yale Avenue. At 1:25 p.m., Brest drove to the area to wait for the defendant to arrive. At about 2:12 p.m., the defendant texted Brest to say she had arrived and was parked at the gas station located in the same parking lot. Brest got out of his undercover vehicle and walked toward the gas station. He looked around and, after not seeing anyone at the gas station, began to walk back to his vehicle. When he did, a gold Honda Civic bearing Colorado license plate OUZ450 pulled up next to him. The defendant rolled the driver's side window down and told Brest to follow her to a neighborhood. Brest told the defendant he needed to hurry and get back to work, but he agreed to follow her.

The defendant pulled out of the parking lot quickly, making it impossible for Brest to follow her. She sent Brest a text message which said, "You freaked me out because you don't want to follow me to a side street are you a cop?" Brest replied and asked the defendant to come back because he was "sick" (meaning he was feeling the effects of heroin withdrawal). The defendant replied, "Do you have anything showing that you do

7

Heroin like do you have a needle or a straw or something." Brest responded he would show her his "tracks." The defendant asked Brest to send her "pics." Brest sent a picture of what looked like track marks. Brest also told the defendant he had back surgery and would show her his scar on his back. A short time later, the defendant appeared back in the parking lot at 6460 E. Yale Avenue and pulled her car next to Brest. She rolled her passenger side window down and again told Brest to follow her.

Brest followed the defendant out of the parking lot and south on Monaco Street to Bates Avenue. The defendant turned east on Bates Avenue and pulled over. Brest pulled his vehicle behind her. The defendant immediately got out of her car and began to walk back to Brest's vehicle. Brest got out of his vehicle and met the defendant in the street between the two vehicles. Brest pulled up the back of his shirt and showed the defendant a large scar on his back from back surgery. The defendant then said, "Ok sorry, here you go." The defendant handed Brest two baggies: one containing brown powder heroin and one containing black tar heroin. In total, the bags contained 1.879 grams of heroin. Brest handed the defendant $160 in U.S. currency. The two got back in their respective vehicles and left the area.

A short time later, Brest received a text message from the defendant which said, "I'm sorry I got so freaked out," and another text message which stated, "I got you from now on each bag contains two different kinds so plea make not of which one you like better so I can give you that one next time."

<u>The Undercover Officer Buys 1.046 Grams of<br>Heroin from the Defendant on July 3, 2019</u>

On July 3, 2019, at about 9:20 a.m., Brest contacted the defendant by text message on phone number (720) 791-5073 to arrange another heroin deal. Brest

arranged to meet the defendant in the area of Home Depot at 3130 S. Sheridan Boulevard, Denver, Colorado. Brest told the defendant he wanted to buy two grams of heroin. The defendant agreed to meet Brest for the deal.

At about 11:40 a.m., Brest received a text from the defendant stating that she only had a gram left and could bring it and then go get more from her source and bring the rest to Brest at a later time. Brest agreed and the defendant said she was on her way. Brest drove to the Home Depot parking lot at 11:50 a.m. to wait for the defendant. Other agents set up in the parking lot to observe the undercover buy operation. At 12:03 p.m., the defendant pulled into the parking lot and parked directly to the north of Brest. The defendant was driving the same gold Honda Civic she drove to the deal on June 25. Brest got out of his vehicle and met the defendant at the window of her car. Brest handed the defendant $80 in U.S. currency. The defendant then handed Brest a plastic baggie containing 1.046 grams of heroin. Brest walked away and the defendant drove out of the parking lot.

After the deal, officers followed the defendant as she went and met with her source of supply for heroin. Officers saw the defendant drive to the 9700 block of E. 7th Avenue in Denver, Colorado. Shortly after the defendant parked, a blue/grey Jeep Grand Cherokee parked in the area of the defendant's car. The Jeep had a female driver and a male front passenger. The male got out of the Jeep and into the front passenger seat of the defendant's car. After a short period, he got out and went back into the Jeep. The defendant then sent Brest a text message informing him she had resupplied with heroin from her source.

### The Undercover Officer Buys 1.738 Grams of Heroin from the Defendant on August 29, 2019

On August 29, 2019, at about 9:30 a.m., Brest contacted the defendant by text message at (720) 791-5073 to arrange another heroin deal. Brest told the defendant he wanted to buy two grams of heroin and arranged to meet her in the area of 52nd and Sheridan Boulevard in Arvada, Colorado.

Brest arranged for surveillance at the Dollar General at 5300 Sheridan Boulevard, Arvada, Colorado, and drove to the location at approximately 12:15 p.m. At 12:30 p.m., the defendant pulled into the parking lot and parked directly to the west of Brest. The defendant was driving a silver Chevy Malibu with Colorado temporary license plate 1116063. Brest got out of his vehicle and met the defendant at the window of her car. Brest handed the defendant $160 in U.S. currency. In return, she handed him a plastic baggie containing 1.738 grams of heroin. The defendant told Brest she was driving a rental car because she was getting a new car because the Honda was totaled by hail damage.

### The Undercover Officer Buys 1.848 Grams of Heroin from the Defendant on October 14, 2019

On October 14, 2019, Brest contacted the defendant by text message at (720) 791-5073 to arrange another heroin deal. Brest told the defendant he wanted to buy two grams of heroin and arranged to meet her in the area of the Home Depot at 3130 S. Sheridan Boulevard again.

Brest arranged for surveillance at the Home Depot and drove there around 12:50 p.m. At approximately 12:58 p.m., the defendant sent Brest a text message saying she had arrived in the area and asked Brest where he parked. Brest directed the defendant

to where his vehicle was parked. At 1:03 p.m., the defendant pulled into the parking lot and parked directly to the south of Brest's vehicle. The defendant was driving a black Toyota Avalon with Colorado license plate YKO662. Brest got out of his vehicle and met the defendant at the window of her car. Brest handed the defendant $160 in U.S. currency and the defendant handed Brest a plastic baggie with 1.848 grams of black tar heroin inside. Brest walked back to his vehicle and the defendant drove away.

The Undercover Officer Buys 2.027 Grams of
Heroin from the Defendant on October 30, 2019

On October 30, 2019, Brest again contacted the defendant on phone number (720) 791-5073. Brest requested that the parties meet so Brest could purchase two grams of heroin. The defendant agreed to meet Brest at the Wendy's restaurant located at 857 E. Colfax Avenue, Denver, Colorado. At approximately 3:45 p.m., Brest and the defendant met at that location and the defendant provided Brest with 2.027 grams of heroin in exchange for $160. At the conclusion of the controlled purchase on October 30, task force officers and uniformed officers arrested the defendant.

## VI. ADVISORY GUIDELINE COMPUTATION AND 18 U.S.C. § 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States

11

Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

A. The base guideline is §2D1.1(a)(2), with a base offense level of **38**.

B. The are no adjustments for specific offense characteristics.

C. There are no victim-related, obstruction, or multiple count adjustments.

D. The adjusted offense level, therefore, would be **38**.

E. <u>Acceptance of Responsibility</u>: The defendant should receive a **3-level decrease** for acceptance of responsibility under §3E1.1, resulting in a total offense level **35**.

F. <u>Criminal History Category</u>: The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's Criminal History Category would be I.

G. Assuming the criminal history facts known to the parties are correct, the career offender/criminal livelihood/armed career criminal adjustments do not apply.

H. <u>Imprisonment</u>: The advisory guideline range of imprisonment for the sole count resulting from an offense level of **35** and a Criminal History Category I is **240 months** (the mandatory minimum sentence imposed by 21 U.S.C. § 841(b)(1)(C)). However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the estimated offense level for the sole count could conceivably result in a range from 240 months (the mandatory minimum sentence imposed by 21 U.S.C. § 841(b)(1)(C)) to 365 (top of Category VI). The guideline range

would not exceed, in any case, the statutory maximum applicable to the count of conviction.

     I.     <u>Fine</u>:  Pursuant to guideline §5E1.2 and 21 U.S.C. § 841(b)(1)(C), assuming the estimated offense level of **35**, the fine range for this offense would be **$40,000 to $1,000,000**, plus applicable interest and penalties.

     J.     <u>Supervised Release</u>:  Pursuant to guideline §5D1.2 and 21 U.S.C. § 841(b)(1)(C), if the Court imposes a term of supervised release, that term is **at least 3 years and up to life**.

The parties understand that, although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less

than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

This document (and any supplements) states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 10-27-20

Alicia Morelli
Defendant

Date: 10/27/20

Mary V. Butterton
Attorney for Defendant

Date: 10/27/20

Peter McNeilly, Assistant U.S. Attorney
Attorney for the Government